I think it's actually closer to Arkansas right now, surprisingly enough. Sad to hear. The next case for argument is 17-1584 Meridian Engineering v. United States. 17-1584 Meridian Engineering v. United States We're ready. Let's give everybody a chance to get settled in their seats before we start. Ms. Panicelli. Good morning, Your Honor. My name is Maria Panicelli. I'm here representing Meridian Engineering Company. They were the plaintiff in the underlying court of federal claims case, and they are the opponent in the instant litigation for the panel this morning. The issues at the core of this case are exceedingly simple. This was a core design project, and as such, they provided Meridian and the other offerors with specific information upon which Meridian was meant to rely concerning how this project could be successfully constructed. Meridian was an experienced Southern Arizona contractor, right? It was, correct. It's familiar with the geology of Southern Arizona. It was, yes. But again, the geotechnical information provided as part of the contract is known to be, and it's accepted by the case law, the most reliable indicator of the subsurface conditions in one particular area. So consistent with the case law, and as Meridian, as a sophisticated contractor, knew it could, it relied upon the information that was provided as part of that contract. Unfortunately, this information ultimately proved to be wholly inaccurate, due largely to the fact that the design was outdated. As a result, Meridian incurred substantial damages, and in analyzing Meridian's entitlement to recoup those damages, the court below made numerous errors. At page 28 of the blue brief, you say the CFC erred because it appears to require an independent geotechnical analysis. Yes. Where in the opinion below does the court require an independent site analysis? In its discussion regarding the second element of the differing site condition claim, which I believe is on page 36 to 37 of the opinion, which I think is pages 37 and 38 of the appendix, it talks about at the top of that page that Meridian should have experienced, or I'm sorry, it should have been reasonably foreseeable, the actual conditions, because Meridian should have wanted to investigate whether there were unstable, saturated conditions upstream. This is also consistent with things that the court, the judge, said during the trial to us, both on and off the record, including at appendix, you can find that in a second, but the court made it clear throughout the trial that her view was that the burden lay on the contractor to do an independent geotechnical investigation. That's simply not consistent with the case law, Foster, Betkaff, which is this court's 2014 decision. And to the extent that the government has argued that, you know... Where in southern Arizona is there not hardpan caliche? I think, again, it depends on each area is different, and you can't just make general assumptions about, you know, areas, geographic areas, either based on the state or based on even being in a floodplain. You always have to go back to the specific geotechnical information that was submitted as part of, or I'm sorry, available as part of the solicitation. And here, the specific geotechnical information that was available to the contractors indicated hard, unyielding material that could be easily dewatered, that was small, granular in size, and that even if it was plastic in some places, it was not in a fluid condition. Was that determination based on the boring test that they had conducted? Yes, Your Honor. It was based on the boring logs as well as the test holes and the test trenches. And as explained in our brief and all the record sites that are cited therein, Meridian established at trial that a thorough expert analysis or experienced contractor analysis are both consistent, and that those boring logs, test trenches, and test holes demonstrated that there was really no reason to think that the soils would be unstable or unsuitable for construction. They wouldn't be in fluid condition based on what was reflected in those boring logs, test trenches, and test holes. To the extent the court reached an opposite conclusion, it was based on one page of non-expert testimony that dealt primarily with three test holes that were in a far off part of the project area, and actually not even technically part of the project area. Mr. Chicky's testimony, which is the sole piece of testimony that the court cites when talking about the first or second element. I guess I had the same impression as Judge Wallach. I grew up in New Mexico. I've been to Nogales a number of times, but it would be hard for me to say just that Nogales is sitting on hard rock and there's not these problems with water. I mean, the rivers are running north, from south to north. It's an odd situation. Now I realize that Meridian is relying on these boring tests, but weren't those kind of outdated? And as you say, they were contradicted. Some showed a different type of soil condition. I think there's a couple answers to that question. Yes, they were outdated. And set aside my layman's view of the Nogales area. No, but that's an interesting point, because I think that's a lot of what plays into it. And to be frank, before I ever used to do this type of work, I would have made the same sorts of common sense assumptions. You guys are an experienced engineering company, and Tucson's not too far from Nogales. True. No, and I think they did have experience, but given the case law and given what the contractors are allowed to rely upon, they placed their reliance on the boring logs and on the test holes and the test trenches. And the reason for that is that's the most... Well, that's true, but it's also they place a reliance on part of their experience. They say, looking at these boring tests, and I guess in addition to our own experience and our own knowledge that we've built over time, we're willing to take this risk. And it's laid out. Well, it's laid out, but again, the case law, and this includes the Foster decision and also this court's 2014 Metcalf decision, is pretty straightforward about the fact that even the disclaimer that is written into boring logs or other sort of geotechnical information can't function to shift that risk from the government to the contractor. The whole purpose of the differing site conditions clause used to be called the change conditions clause, but the purpose of both of those clauses is to take part of the gamble out of the bidding process for the contractors and to prevent them from building in contingencies into their bidding process. And under this type of contract, the risk is shifted over to Meridian, correct? No, Your Honor. It would still be on the government. Well, it's a firm fixed price contract. It is. And under those type of contracts, the contractor assumes the risk. It assumes the risk as long as the conditions are as they were indicated in the contract. To the extent that they weren't indicated in the contract, that's why the differing site conditions clause is incorporated in the contract to account for precisely this situation where a firm fixed price is given based on the bid, and based on the, I'm sorry, the bid is based in turn on the geotechnical information that's provided as part of the contract. To hold anything different would in fact read the differing site conditions clause out of the contract and it would shift all the risk back to the contractor and say that indeed there was no situation where the differing site conditions clause would apply. I think, again, Foster and Metcalf have made it pretty clear that the contractor is entitled to rely on those boring logs and even to the extent they bring their own experience to bear, and that's what Meridian did here, but even an outside independent expert Some of those samples, the boring log samples, showed that not all of the site was rocky ground or based on rock, that there was clay and that there was instability in some of the site. Silty clay with sand, black, wet, medium to high plasticity, and soft. Correct, Your Honor. And I think the thing is, again, the government's argument and the Court of Federal Claims often, when interpreting this, took kind of a common sense or layperson's view. And this is geotechnical expert information and a geotechnical expert, our independent geotechnical expert, Dr. Mahar, took a look at these borings and drew a very specific distinction. Yes, there are places where some of the clay is wet. That doesn't necessarily mean that it's in a fluid state. Wet clay can be dewatered and can still be used as a stable foundation. So why didn't you ask for a clarification at that point, then? I'm sorry? Why didn't you ask for a clarification of the site conditions? Well, again, because the way that the contract is worded and based on the case law interpreting contracts and the FAR, you don't need to ask for clarification unless there's a patent error. Here, there wasn't a patent error. There was geotechnical information, and we were told to bid as you see it. I mean, that's the general instruction that contractors are given. When you're given boring logs, test holes, test trenches, and you're told, here are specific subsurface investigations that the court did in designing this project, you're entitled to rely upon those and bid according to what you think the conditions are represented in the contract. When you then encounter something different, something materially different at the contract site, that constitutes a differing site condition, and you're entitled under the differing site condition clause. There's no requirement that you make a site visit? No. But is that good business practice before you accept one of these contracts? It is in some cases, and I think, again, the Metcalf decision, I can find the page, on page 996 speaks to that specific question. It says the duty to make an inspection of the site does not negate the changed conditions clause. Again, that's what the differing site conditions clause used to be called. By putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available. And I think this was in our reply brief. But given the time available here, the contractors were only given, I think, between two and four weeks in between the time that the solicitation went out and the time that they were expected to respond. Moreover, those two to four weeks were during monsoon season, which is the whole purpose of this. Were the boring logs ambiguous or outdated or both? I wouldn't say they were ambiguous. I think there were some boring logs that indicated there were certain types of soils. There were some boring logs that indicated different types of soils. Meridian looked at all of them, as you're supposed to when interpreting a contract. Were they outdated in your? They were outdated, but again, that's the responsibility of the employer. Why is that not a patent ambiguity? Because it happens all the time. Well, that doesn't answer the question. You know, the fact that there's patent ambiguities all the time doesn't help you. Well, because it's not an ambiguity just because the boring logs are old. In some cases and in some areas. You just said it was an ambiguity that the boring logs were old. No, I'm sorry. If I said that, I misspoke. I said that there was some ambiguity in terms of there were some boring logs that indicated certain types of soils and there were some boring logs or test holes or trenches that indicated different types of soils. It's not Meridian's position that there was an ambiguity regarding the outdated nature of the boring logs. They're the only boring logs the Corps provided. But at that point, you ask for a clarification or, you know, you send somebody down there to look at the site. Again, that's not a possibility. We wouldn't have had time to do that. There were two to four weeks. It was during monsoon season. Tucson is 45 miles from Nogales? It's not a question of that, Your Honor. It's a question of the fact that the two to four weeks was during monsoon season, which means that we wouldn't have had access to actually be able to do any sort of subsurface investigation. And moreover, as I believe Mr. Hayworth testified, and I believe it's laid out in our reply brief, there would have been permits required, and given the time involved, permits wouldn't have been issued to get onto the site. This is land that was owned by the Corps of Engineers at that point. It wasn't land, or I'm sorry, one of the coordinating state agencies. It wouldn't have been possible for Meridian to get the permits to go on the site, even if they had wanted to conduct a site visit and even if the monsoons had let up, such that they would have had access to be able to do that. Oh, come on. They let up. I mean, they only rained for an hour in the afternoon. But the problem is, and this is why this project was being constructed in the first place, the soils in that area, as much as ironically it ultimately turned out to be unstable and liquid underneath, they don't absorb the water. I know. That's what I'm saying. They run off. So again, the water would be flash flooding through the whole area. The whole purpose of this project was to build a channel where that water could flood. I know that. So because of that, they weren't able to get access. And again, I think the case law is clear that there's no responsibility on the contractor to do an independent investigation or to ask for clarification. It's up to the contractor to rely on the boring logs that are provided. And they're often outdated when you're dealing with government agencies. It often happens that the government does certain investigations, does their site investigations, designs the project, and then has to wait for funding. And in fact, that's what happened here. It doesn't mean that the responsibility passes to the contractor or that it's akin to a contradiction or a conflict in the specifications, which is usually what you see when you're talking about a defective specification. You're well into your rebuttal. It's up to you if you want to use it, if there's a point you want to make. No, I'll save it. All right. Thank you. Thank you. Thank you. May it please the court. As your Honor recognized, Meridian entered into a firm-fixed price contract. Before you get into the— You want to— I was going to go to a different issue. So if you want to ask about the site. No, no, unpaid contract. You want me to? Yes, go ahead. Your expert, Mr. Weathers' testimony on which the CFC relied, was submitted two months prior to when Meridian submitted its second amended complaint, which alleged unpaid contract quantities in the amount of $358,000. Mr. Weathers only found $326,000. Even if we credit Mr. Weathers' calculation, wouldn't we find that Meridian was still owed $31,000 and change? No, your Honor. Our calculation is that there's an overpayment of $326,000, or at the time of Mr. Weathers' calculation, it's now about $83,000. So $83,000 should come from Meridian to the government. Their position is that $383,000 should go from the government to Meridian. So the parties are, I guess— Wait a second. Has your number changed from when Mr. Weathers calculated it? Is that what you're saying? Yes, as part of our damages trial, the parties stipulated that one payment that Meridian had initially counted as two separate payments of something like $514,000, it agreed to previously credit a portion of that payment to Count 6, and then reallocated that payment to Count 8. So a portion of that payment was accounted for in Count 8 as a part of the damages trial in June of 2016. However, there's still a delta. There's still an overpayment made by the government in approximately, I think, $80,000. Okay, I'm— So the delta between the parties has shrunk, but— Well, I don't know. What are we supposed to do with it? I mean, we're looking at this issue. The District Court, the Court of Federal Claims Judge, page—appendix 43 and 44. I mean, there's like two paragraphs discussing this whole thing. So I'm having a hard time seeing how we can review that as it is, and now you're adding more stuff in that I guess undoes some of this stuff. I mean, does the inquiry remain the same? We're supposed to review this opinion and this decision by her. Yes. It's hard to—you know, we don't have very much meat on these bones, but now you're saying that this isn't any longer operable? No, that's not what we're saying. There's this—whether Meridian would have to deduct from their judgment $300,000 or $80,000, the overpayment still exists. Okay, so that's just an initial matter. The second issue is— Is that stipulated? It's—the crediting of this payment was stipulated, and that's in the record. But there is still a delta of overpayment that the parties— even though they say—even though Meridian says in a footnote that we— that all of that overpayment—all of the payment was credited as part of the damages trial. That's simply inaccurate. But to— Well, then it's not agreed to. Okay. But to your question earlier, Chief Judge Prost, the parties made a record in front of the court. Both experts submitted opinions and submitted their testimony concerning the overpayments. And ultimately, what the trial court found was that the United States was not liable. It didn't necessarily make a determination of the accounting, but it made a determination that, I guess, whatever Meridian claimed it was underpaid was— whatever, I guess, whatever delta between the parties, there was no—it didn't— there was no money coming that was due Meridian for those unpaid contract quantities. There was testimony about those quantities, so that was part of the resolution on Count 6. And to the extent that the court were to remand that, there is a risk that it will actually end up with less than the judgment that it already received. Well, we're not going to decide a case because the risk— No. They've appealed the question. We're not going to say, well, we're not going to send it back. Of course. It was just surprising that they were to appeal that. But can you look at Appendix 44? Do you have that? Because I'm just trying to find— Paragraph C is—5C is the court's resolution. Yes. So what is your understanding of the resolution? Our understanding of the resolution was that the— we claimed that we had overpaid Meridian for certain contract quantities. Okay. Because we had overpaid them for certain contract quantities, we were entitled to set off those amounts from other amounts that were due, that we acknowledge were due, for Clound 780. And was that a disputed fact? I mean, you say because we were. First you said we claimed and then say because we were. Was it disputed that you were— Was it disputed that you were owed this amount? Oh, Meridian disputed that we were owed that. Okay. That we were due a credit for overpayments. Okay. And the district court says— And the trial court found that we weren't liable to them for any— for their claim for underpayments. Because? Because we were entitled to offset amounts due to the government from any amounts due to Meridian. Well, where's the analysis of the merits of your claim? Well, first of all, we didn't raise a claim. It was an affirmative defense. It was an affirmative defense of set off to their affirmative claim that unpaid contract quantities weren't paid. So where is the analysis of that there was an adequate set off? How do we discern the CFC's logic? Well, it's an initial matter. This court reviews judgments, not necessarily the evidence. So in light of the fact that there is a— both parties put together an evidentiary record. They put on experts at trial to testify about these matters, about these quantities. And the court ultimately came to a resolution, and it's a claim for money, and it came to a resolution that no money was due to Meridian. That's what you can discern from the opinion. We can discern that from the opinion, but what you're suggesting is since we review judgments and if we don't think we have an analysis, we should just go and do the analysis on our own. I would say the analysis of— we don't expect the court to do some sort of accounting, but the court can certainly agree that no money— is liable for these alleged contract quantities, given that the trial court made implicit factual determinations that we were not liable. Because you had been— So you should affirm is what you're saying. We would ask the court to affirm, yes. Did the court make in the first instance, did it apply the accordance satisfaction factors for count four? It did. Show me where that happened. Well, with respect to count four or whether it's count five, the release and the release language are identical. So the principles and the rationale that would apply to— You want me to take what the court said about count five and shift it on to count four? Well, the logic is exactly the same, and the modification language is exactly the same. Is that what the court said? Well, as an initial matter, Meridian doesn't allege that they didn't sign these releases or that these releases aren't binding. They're saying that there's an exception. So that's the underlying principle. They do argue that the court did not apply. They argue that, but that's not what the— Well, when I look at the court's judgment, I see that perhaps they did, and that's why I'm giving you the chance to say that the court did. Well, what the court did was consider Meridian's argument that an exception to accord and satisfaction applies. Meridian doesn't deny releasing the United States from liability concerning these flood events or from the sewer relocation. What they argue is that the release doesn't apply because the parties continued— or because the government, there was some sort of conduct. Internal conduct. Internal conduct and internal deliberation prepared in the context of a potential settlement that Meridian had no idea about until discovery after it initiated a litigation. So that brings us to the point, one of the elements being a meeting of minds. It would seem to me whether there's a meeting of the minds that that may change from case to case, but here there's only one mind that's in accord. I mean, there is no meeting of the minds. I don't see that the two parties had the same viewpoint here. Let me show you, Your Honor. If you look at the record, it contains the actual modifications that are at issue. If you look at page— You're going to have to cite the volume of the record. Yeah. Oh. Do you want to know the volume? Okay. Well, do you have anything in the court of claims opinion where she speaks to this? Maybe that would help. Well, the meeting of the minds, she'll tell you. I'm looking at 42, but I don't know if that's where the actual— where she's talking about community heating and plumbing. Okay. Well, first, in the context of— on page 39, it talks about a meeting of the minds in the context of the release for the sewer line. And she cites the contract language. The contract price increase is indicated above, which reflects all credits due to the government and all debits due to the contractor, and it goes on. And she said that that language reflected the meeting of the minds. That precise language is in the same— is in the bilateral modifications that Meridian entered into with the government on the flood events claims. Where is that again? Page 40? In 39, she explains why the release language constitutes a meeting of the minds. That same language is a language that applies to the flood events claim. So there's no basis for her to— for anyone to assume that that language, which constituted a meeting of the minds with respect to one bilateral modification between the two same parties, would not constitute a meeting of the minds with respect to another bilateral modification. But what about the memorandum, the government's memorandum, that stated it owed— in regard to this issue, it owed Meridian close to half a million dollars? Oh, the internal one? The internal one, yeah. Well, the internal one— Why isn't that relevant to the meeting of the minds? No, it's not, Your Honor, because that was prepared after— after any of these— after these modifications were signed. The fact that one party, you know, considers in the context of potential settlement, you know, in an effort to close out a contract, paying more money— But you're asking for information from Meridian in this regard, and they're not giving it to you. Well, the government— the government didn't want a litigation. I mean, there is strong federal policies for having the government resolve things at the administrative level. I mean, this was a case filed in 2011 for a project performed in 2008 and 2009. The government's hopeful that it could resolve that— resolve that in 2009. So to the extent that it puts together, you know, a potential— you know, as part of a potential package that, first of all, wasn't signed by all the necessary parties and wasn't presented to Meridian and no negotiations were held as reflected in the language of that draft modification, I mean, that's not binding on the government, and that doesn't reflect any sort of continuing negotiations or any of the other factors that this court has considered. But on the other hand, the government is asking for additional information from Meridian. It asked several times, and Meridian wasn't giving you that information. Doesn't that indicate ongoing negotiation of some sort? No. But if you can ask somebody— first of all, it's not necessarily with respect to those identical— those identical releases. But that the government wanted— if the government wants to sit down with the contractor, knowing that they have potential claims against it, in an effort to resolve it at the administrative level, if just doing that could undermine the comfort that either party receives from entering into a bilateral modification, then what's the point of entering into a bilateral modification? Well, you have a different point, too. My understanding is that the government's internal discussions in order to represent a government position have to be approved in certain fixed ways by certain fixed people. That's correct. And that didn't occur here. That didn't occur here. The argument— and first of all, this is very important. First of all, the argument is that community heating and plumbing allows the court to consider after modification, post-modification conduct. That's a fact question. Whether or not the parties entered into negotiations or continued to consider that, the court looked at the evidence presented and determined that it didn't establish. It's a fact question. Why would we impute the court's reasoning under Count 5 to Count 4? Well, the important part of Count 5 is not in Count 4. For both counts, it's not that they didn't really enter into a release or it really didn't enter into these bilateral modifications. They're saying that continuing negotiations— No, my concern is whether the court actually undertook an accord and satisfaction analysis for Count 4. I know it did for Count 5. All of the elements for both are the same. So even if the court didn't copy and paste the same language or just change the modification numbers, the analysis is identical. How do I know that? How do you know that? Yeah. Or I should say the analysis, the underlying information on which the court— Well, that's true. That's identical. But how do I know how the court viewed that underlying information? It could have viewed it differently for Count 4 than it did for Count 5. You're arguing on behalf of the court and what I'm pointing out and I want you to help me with, it just seems to me that this analysis is missing with respect to Count 4. You're correct. The court didn't go through each one of those steps. All right. Shouldn't the court have to do that? I can't speak to what the court should or shouldn't have to do. I think the analysis— That's our job. That's our job. But I'm asking you, as an officer of the court appearing, help me with that. Our argument is that you have bilateral modifications between the same two parties containing the exact same release language. So unless there's some information that Meridian could point to to show that the analysis would somehow be different with respect to the flood events than it would with respect to the sewer line, without that, we have every reason to believe that the analysis was the same because the release language that reflected the meeting of the minds is identical. Okay. Thank you. Oh. Is my time up? It's long enough. Well, respectfully, we request that the court affirm the judgment below with the correction regarding the interests that we mentioned. I just wanted to first, I guess, clear up going back to what we had talked about while I was up here for my opening statements. If you look at the case law that is summarized on page 34 to 35 of the opinion, the Court of Federal Claims opinion itself, and then the arguments on page 28 through 31 of our opening brief, I think you'll find, you know, a lot more information regarding whether or not the contractors are required to go and do any sort of site investigation. With regard to the accord and satisfaction issues that my opposing counsel just touched upon, I think the court has hit the nail right on the head. There's absolutely no analysis of the meeting of the minds or any other element with regard to the Meridian's Count 4 flood events. With regard to the meeting of the minds analysis... If the underlying facts are the same with respect to Count 4 and Count 5, is it, should we impute the satisfaction and accord test from Count 5 to Count 4? I don't believe so, no, Your Honor. Why? I think the case law is clear that if the conclusions are sparse or conclusory... Well, if the conclusions are looking at the same release language and the same conduct afterwards, and saying, with respect to one count, this is not sufficient to displace the accord and satisfaction conclusion, why wouldn't, why not? What's different? What factual difference is there? I understand what you're saying. I think the key is that, you know, the court still did not go through the analysis and it would be unfair to... No, no. You understand what I'm saying, then answer it. What factual difference? I'm sorry, Your Honor. There were no factual differences, and I think in either case, then it's nonetheless both accord and satisfaction defenses are barred by community heeding. The court's interpretation focused on the negotiations... So, if we disagree with you on one, we disagree with you on the other? With regards, perhaps, with regard to the language in the modification, yes, but I think even in that case, then you have to take  and that bars any account accord and satisfaction defense. Thank you. Do you think both sides of the case disagree? I think both sides agree that the court I just want to add to what Judge Reyna said. When I was a little boy in the mountains in southern Arizona, when I crossed the dry wash, we didn't have stop, walk, don't walk signs. My parents would say, look up on the mountain and see if there's a cloud because you know there's a flash flood coming.